FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 19 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

YARIN NADEL aka JOE NADEL, JOE MILLER;
MICHAEL NADEL aka MICKEY MILLER;
MOVING STATE TO STATE LLC;
STATE TO STATE MOVING NY INC.;
STATE TO STATE MOVING GROUP LLC;
DIRECT VAN LINES SERVICES INC.; and
AROUND THE CLOCK MOVING SERVICES INC.;

        Defendants.

COMPLAINT

Civil Action No.

**CV 19-1578**

BRODIE, J.

POLLAK, M.J.

---

Plaintiff, the UNITED STATES OF AMERICA, by and through the undersigned attorneys, hereby alleges as follows:

## INTRODUCTION

1.    The United States brings this action for a temporary restraining order, preliminary and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345, in order to enjoin the ongoing commission of criminal wire fraud in violation of *inter alia* 18 U.S.C. § 1343. The United States seeks to prevent continuing and substantial injury to victims of fraud.

2.    Defendants are using wire communications, including the use of the internet, electronic mail, and telephones, in interstate commerce to transmit fraudulent representations in order to obtain money and property.

3.    Specifically, defendants Yarin and Michael Nadel are conducting an ongoing fraudulent scheme through their interstate moving business, defendants Moving State to State LLC, State to State Moving NY Inc., State to State Moving Group LLC, Direct Van Lines Services

Inc., and Around the Clock Moving Services Inc. (collectively, the Corporate Defendants or "State to State"). The defendants market services as moving brokers and/or carriers on the internet. When contacted by potential customers, the defendants make fraudulent statements designed to induce the potential customers to retain defendants' services and provide money and property to defendants. Later, after receiving the victims' property, the defendants make further misrepresentations in order to secure additional monies from the victims. If the victims refuse to pay additional monies, the defendants place the victims' property into storage and refuse to deliver the property until they receive the additional payments. If the victims continue to refuse to make the additional payments, the defendants threaten to sell or auction off the victims' property.

4. For the reasons stated herein, the United States requests injunctive relief pursuant to 18 U.S.C. § 1345 to protect victims from the loss of their property and to enjoin defendants' ongoing scheme to defraud using wire communications in violation of *inter alia* 18 U.S.C. § 1343.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345.

6. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) & (2).

## PARTIES

7. Plaintiff is the United States of America.

8. Defendant Yarin Nadel resides in Fresh Meadows, New York, located in the Eastern District of New York. Yarin Nadel also does business as, is also known as, and holds himself out as Joe Nadel, or New York Joe. Yarin Nadel conducted and directed the fraudulent acts alleged herein while within the Eastern District of New York.

9. Defendant Michael Nadel is Yarin Nadel's father. Michael Nadel also does business as, is also known as, and holds himself out as, Michael Miller. Michael Nadel conducted and directed the fraudulent acts alleged herein while within the Eastern District of New York.

10. Defendants Yarin and Michael Nadel direct and control the Corporate Defendants and use those corporate entities to perpetrate the fraudulent scheme alleged herein. Both Yarin and Michael Nadel operate the Corporate Defendants out of offices located in Fresh Meadows, New York (the "Fresh Meadows Office"), located in the Eastern District of New York.

11. Defendant Around the Clock Moving Services Inc. ("Around the Clock Moving") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. Around the Clock Moving was registered with the New York State Department of State on or about November 4, 2015. Around the Clock Moving designated defendant Michael Nadel as its registered agent for service of process, providing a Fresh Meadows, New York address for service.[1]

12. Defendant Direct Van Line Services Inc. ("Direct Van Line") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. Direct Van Line was registered with the New York State Department of State on or about December 16, 2016.

13. Defendant State to State Moving NY Inc. ("State to State Moving NY") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. State to State Moving NY was registered with the New York Department of State on or about February 7, 2018.

---

[1] The Fresh Meadows address provided for service on Michael Nadel as Around the Clock Moving's registered agent is different than the Fresh Meadows Office address, where Yarin Nadel also resides.

3

14. Defendant Moving State to State LLC ("Moving State to State") was registered with the New York State Department of State on or about April 6, 2018.

15. Defendant State to State Moving Group LLC ("State to State Moving Group") was registered with the New York Department of State on or about October 10, 2018.

### **DEFENDANTS' ONGOING FRAUDULENT SCHEMES**

16. The defendants advertise interstate moving services on the internet.

17. When contacted by the public through the internet, or by electronic mail or telephone, defendants provide bids to move the individuals' personal property. During communications with potential customers over interstate wires, the defendants make a series of material misrepresentations designed to induce the potential customers to retain defendants. After the customers retain defendants to provide the moving services, the defendants schedule a pick up date when the defendants' agents arrive, pack up the victims' belongings and place them onto a moving truck or van. But, after all of the customers' belongings have been loaded, the defendants demand exorbitant additional sums to be paid by cash, postal money order or, in at least one instance, credit card. If the victims refuse to pay the additional amounts, instead of delivering the belongings as promised, the defendants place the items in storage until the victims pay the marked up prices. If the victims refuse to pay the additional sums, the defendants threaten to sell or auction the items. The victims are forced into a Catch-22 scenario of either paying the extortionate additional fees, being deprived of their property for months, or even potentially permanently losing their personal property.

**Representative Examples of the Fraudulent Scheme**

**Customer-1**

18. In September 2018, Cory Hammock, an individual residing in Virginia ("Customer-1") planned to move to Utah and used a moving broker to find a moving company. Through the broker, Customer-2 was put in contact with defendants, and their agent Grant Kennedy.

19. Kennedy communicated to Customer-1 that defendants' rates for moving were based on the total weight. Kennedy also told Customer-1 that defendants had their own truck. In an August 31, 2018 email from grant@statetostateny.com, defendants misrepresented that they would move Customer-1's property for a price of $5,995.55.

20. Defendants also misrepresented that Customer-1 would only be required to pay $3,000 at the start of the move.

21. In reliance upon defendants' misrepresentations, including as to the price, Customer-1 retained defendants to move his property for $5,995.55.

22. On the day of the move, defendants' agents arrived with a Budget Rental truck, not a truck owned by defendants. Before loading the vehicle, defendants' agents knowingly and intentionally failed to tell Customer-1 that (a) he would have to pay material additional sums in addition to the price previously quoted, or (b) that defendants would not deliver his property until he paid defendants the additional sums.

23. After loading the moving truck with Customer-1's property, defendants' agents demanded that Customer-1 pay approximately an additional $1,300 in order to proceed with the move. Customer-1 refused to pay the additional amount. Thereafter, the defendants' agents placed Customer-1's property into storage. Subsequently, defendants refused to deliver Customer-1's property until the additional amounts were paid.

24. In October 2018, Customer-1 filed suit against defendant Moving State to State, LLC; defendant State to State Moving NY Inc.; Mickey Miller, who in fact is defendant Michael Nadel; Joe Miller, who in fact is defendant Yarin Nadel; as well as certain another corporate entity and other individuals believed to be agents of defendants, specifically State to State Moving Group LLC; Natalie Schmid; and Does 2-6 (collectively, the "Private Suit Defendants"). *See Hammock v. Moving State to State, LLC, et al.,* 18-CV-5628 (SJ)(ST).

25. On January 4, 2019, United States District Judge LaShann DeArcy Hall issued a temporary restraining order against the Private Suit Defendants in that action, which prohibited the Private Suit Defendants from disposing of Customer-1's property.

26. On or about January 4, 2019, a process server served the January 4 order at the Fresh Meadows Office. In response, the Private Suit Defendants indicated that they intended to proceed with selling Customer-1's property on January 10, 2019.

27. On January 8, 2019, United States District Judge Sterling Johnson issued a second restraining order against the Private Suit Defendants. On or about January 10, 2019, a process server served the January 10 order at the Fresh Meadows Office.

28. On January 11, 2019, Customer-1's counsel filed a status report to the Court stating that the Private Suit Defendants had not complied with two successive court orders and that defendant Yarin Nadel indicated that defendants did not intend to comply with the orders.

29. On or about February 18, 2019, the Private Suit Defendants told Customer-1's counsel, in sum and substance, that they would release Customer-1's goods if Customer-1 dropped his lawsuit. The Private Suit Defendants told Customer-1 that they would only release Customer-1's goods if the customer paid the storage fees.

30. On January 8, 2019, the Private Suit Defendants e-mailed Customer-1's counsel that Customer-1's property were located at storage facility in Jamaica, Queens (the "Jamaica Storage Facility"). The contract between defendants and the Jamaica Storage Facility lists the Fresh Meadows Office as the defendants' address. The contract also states that Joe Nadel has control over the storage unit. Joe Nadel is actually defendant Yarin Nadel.

**Customer-2**

31. In September 2018, Angela Bynum, an individual residing in Virginia ("Customer-2") planned to move to Washington and used an online brokerage site to find a moving company. Through the brokerage site, Customer-2 was put in contact with defendants and their agent, Gemma Collins.

32. In an October 3, 2018 email from Gemma Collins, who held herself out as a "Relocation Specialist" for defendant Moving State to State LLC, using the email address gemma@statetostateny.com, defendants stated "The package we built still stands with the total cost of your move at $4773.60."

33. In response to defendants' October 3, 2018 email, Customer-2 emailed a series of questions, including (a) whether defendants were a moving broker; (b) whether defendants were "locking in a certain rate" per pound; and (c) whether the price "will change again."

34. In an October 4, 2018 email, also sent from gemma@statetostateny.com, defendants responded that they "are both a broker and a carrier," that her property would be transported "on a State to state truck," that she was "locked into" a quoted price per pound, and that defendants "never go up on the price."

35. In a telephone call with Gemma Collins on or about October 4, 2018, Collins also told Customer-2 that (a) her property would be the only items on the moving truck; (b) State to

7

State had its own trucks; (c) delivery would occur within 10 days of pick up; and (d) Customer-2 would receive a $500 discount on interstate car shipping by booking shipping services through State to State.

36. Customer-2 selected defendants because, although they provided the highest quote, Customer-2 believed the promised service was worth a premium.

37. Customer-2 believed the promised service was worth a premium because State to State misrepresented that, among other things: (a) that the quoted price was "locked in" and would "never go up," (b) Customer-2's property would be the only items on the moving truck; (c) State to State had its own trucks; (d) delivery would occur within 10 days of pick up; and (e) Customer-2 would receive a $500 discount on interstate car shipping by booking shipping services through State to State.

38. In reliance upon defendants' misrepresentations, including as to the price, Customer-2 retained defendants to move her property for $4,773.60.

39. On the day of the move, October 13, 2018, defendants' agents arrived with a rental truck from Budget Rental, not a truck owned by defendants. Before loading the truck, defendants' agents knowingly and intentionally failed to tell Customer-2 that (a) she would have to pay material additional sums in addition to the price previously quoted, or (b) that defendants would not deliver her property until she paid defendants the additional sums.

40. After loading the moving truck with Customer-2's property, defendants' agents demanded that Customer-2 pay an additional $3,000 in cash in order for the move to proceed. Customer-2 paid the additional, previously unquoted, amount of $3000.00.

41. Moreover, the interstate car shipper transporting Customer-2 vehicle indicated that they had no understanding with State to State about any discount and refused to provide the $500 discount.

42. After State to State delivered Customer-2's property, multiple items were missing.

**Customer-3**

43. In July 2018, Brian Beauregard, an individual residing in New Hampshire ("Customer-3") was planning to move to South Carolina and used an online brokerage site to find a moving company. Customer-3 selected a moving company named Presidential Van Lines ("PVL") because it provided the lowest quote. The sales representative from PVL indicated that Customer-3's price would be locked in at $5,200 based on a moving weight of 13,000 pounds and that the moves would use an 18-wheeler.

44. On the day of the move, the defendants' agents showed up instead of movers from PVL. The defendants' agents came with a small rental truck from Penske Truck Rental and not the agreed-upon 18-wheeler truck.

45. The defendants' agents told Customer-3, in sum and substance, that they would be moving his property. Defendants' agents then loaded Customer 3's property on the rental truck. But, before loading Customer-3's property, the defendants' agents knowingly and intentionally did not tell Customer-3 (a) that he would have to pay defendants material an additional amount over and above the price quoted by PVL, or (b) that defendants would not deliver Customer-3's property until he paid the material additional sums above the price quoted by PVL. The defendants' agents knowingly and intentionally omitted to disclose these material facts in order to induce Customer-3 to allow the defendants to take custody of his property.

46. After taking custody of Customer-3's property, defendants' agents told Customer-3 that his quoted price of $5,200 was no longer valid and that he now owed at least $10,000. Subsequently, Customer-3 contacted defendant Yarin Nadel, also known as Joe, regarding the higher price and Yarin Nadel stated, in sum and substance, that Customer-3 was required to pay the additional amount in cash or U.S. postal money order, or defendants would not deliver Customer-3's property.

47. As a result of the foregoing, Customer-3 paid defendants the $10,000 unquoted fee with a money order. Defendants ultimately delivered some of Customer-3's property, albeit two weeks late. Nevertheless, multiple high-dollar items worth approximately $30,000 were missing.

### Defendants' Fraudulent Representations

48. Defendants make a series of fraudulent misrepresentations in order to induce victims to (a) retain defendants to move their property; (b) rely upon defendants to move their property, to the exclusion of making alternate arrangements; (c) allow the defendants and their agents to take custody of their property; and (d) to make payments to defendants.

49. Defendants' misrepresentations include, but are not limited to:

    (a)    that the quoted and agreed-upon price was accurate, and that any variances would be capped;

    (b)    that the customers' property would be the only items on the moving truck;

    (c)    that State to State had its own trucks;

    (d)    that State to State would move the customer's property in an 18-wheeler truck;

    (e)    that State to State would deliver the customer's property within an agreed-upon window, subject only to force majeure circumstances; and

    (f)    that State to State could arrange discounts on other associated services, i.e., rental cars.

50. At the time they made the representations to the potential customers, the defendants knew that some or all of these representations were false, or were reckless as to the truth of the statements.

51. Defendants also make misrepresentations on the date of pick up in order to induce victims to make additional payments to them. Specifically, defendants misrepresent the weight of the goods being transported and the necessity and costs of other contingent expenses, for example, the cost for boxing a television, the cost for packing tape used to secure boxes of the victims' property.

52. Defendants knowingly engaged with victims through interstate wires, including email and telephone. State to State used the following email accounts to communicate with clients: info@statetostateny.com, statetostateny@gmail.com, gemma@statetostateny.com, robert@statetostateny.com, and grant@statetostateny.com.

### Defendants' Knowledge Of The Fraud

53. Defendants have repeatedly raised the prices for their services after picking up victims' property, overcharged the victims for services, or refused to deliver victims' property until being paid additional sums by the victims.

54. Defendants know that they will not provide moving services for the prices communicated over the wires to potential customers.

55. Defendants know that the actual prices and deposits required to deliver victims' services are not "capped" by the limits defendants communicate over the wires to potential customers.

56. Defendants know, or are reckless as to the truth or falsity of their representations, communicated over the wires to potential customers, that the customers' property would be the only items transported on defendants' moving vehicles.

57. Defendants know that, contrary to their representations communicated over the wires to potential customers, they do not own their own trucks.

58. Defendants know, or are reckless as to the truth or the falsity of their representations, communicated over the wires to potential customers, that the customers' property would be delivered to the intended location on the date scheduled, subject only to *force majeure* circumstances.

59. Defendants know that, contrary to their representations made over the wires to potential customers, they do not have a relationship with interstate car shippers entitling their customers to a $500 discount.

60. Defendants know that victims are deceived by their representations because *inter alia* victims repeatedly complain to defendants and to the Better Business Bureau that they were deceived and misled by the defendants' misrepresentations.

61. Although the defendants know that their representations are fraudulent, they continue to perpetrate their schemes.

### Harm to Victims

62. Defendants' misrepresentations have harmed victims financially and by depriving the victims' of the possession and use of their personal property.

63. Defendants store victims' personal property in storage units located *inter alia* in Jamaica, Queens. As recently as March 7, 2019, defendants have contacted the storage facility and indicated that they intend to remove the contents of some or all of the storage units in the near

future. Defendants have also threatened to auction off, or otherwise dispose of, victims' personal property if they do not make additional payments. If defendants auction off, sell, or otherwise permanently dispose of the personal property of victims, the victims will be further harmed.

64. Defendants' fraudulent schemes are ongoing. Absent injunctive relief by this Court, defendants will continue to cause injury to recipients of these solicitations.

## FIRST CAUSE OF ACTAION

(18 U.S.C. § 1345 – Injunctive Relief)

65. The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66. By reason of the conduct described herein, defendants violated, are violating and are about to violate 18 U.S.C. §§ 1343 and 1349 by executing a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use wire communications.

67. Upon a showing that defendants are committing or about to commit wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the victims of fraud.

68. As a result of the foregoing, defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff United States of America requests of the Court the following relief:

A. That the Court issue an order, pursuant to 18 U.S.C. § 1345, pending a hearing and determination on the United States' application for a preliminary injunction, that defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them are temporarily restrained from:

    i. committing wire fraud, as defined by 18 U.S.C. § 1343;

    ii. selling, offering for sale, auctioning, consigning, destroying or otherwise disposing of any personal property received from customers for moving, including property stored by defendants on the premises of a third-party, without prior permission and approval from the Court;

    iii. removing personal property originally received from customers for moving, and now stored on the premises of a third-party, from the third-party premises without prior permission and approval from the Court;

    iv. raising the price of delivery, rate "per box," "per item," or "per pound," or the required deposit for services for any customers on the day of pickup or in the preceding 72 hours. Notwithstanding the foregoing, the defendants may quote a rate "per box," "per item," or "per pound," and calculate the number of boxes, items, or net weight of the items transported on the day of pickup, provided they provide weight tickets documenting the weight of the truck with and without the property being transported, a bill of lading, and a receipt.

    v. destroying, deleting, removing, or transferring any and all business, financial, accounting and other records concerning defendants' operations and the operations of any other corporate entity owned or controlled, in whole or in part, by defendants.

B. That the Court further order, pursuant to 18 U.S.C. § 1345, that within 2 days from defendants' receipt of the Temporary Restraining Order and Order to Show Cause, defendants shall provide copies of the Temporary Restraining Order and Order to Show Cause to all storage facilities with which they do business, informing them that defendants cannot take possession of any items in storage without prior permission and approval from the Court, and within 4 days from defendants' receipt of the

        Temporary Restraining Order and Order to Show Cause, defendants shall provide proof of such notice to the Court and the United States, including the name and addresses of the entities and/or individuals to whom the notice was sent, how the notice was sent, and when the notice was sent.

C.    That the Court further order, pursuant to 18 U.S.C. § 1345, that within 5 business days from defendants' receipt of the Temporary Restraining Order and Order to Show Cause, defendants provide an inventory of the contents of all facilities containing the personal property of defendants' customers; that said inventory shall include:

    i.    the address of the storage facility,

    ii.    the number or identifier of any storage unit (e.g., locker #2, storage unit #112),

    iii.    the name, telephone number and e-mail address for any of defendants' customers whose personal property are stored in the storage unit,

    iv.    the number of boxes of the customer's personal property stored in the storage unit, and

    v.    the number and type of any non-boxed items belonging to defendants' customers stored in the storage unit

(e.g., ABC Storage Center, Storage Unit 112, Customer John Doe, telephone (212) 555-5555, JohnDoe@aol.com, 10 boxes, 1 couch, 2 bicycles).

D.    That the Court issue a preliminary injunction on the same basis and to the same effect.

E.    That the Court issue a permanent injunction on the same basis and to the same effect.

F. That the Court order such other and further relief as the Court shall deem just and proper.

Dated: March 19, 2019
Brooklyn, New York

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: _____
JOHN VAGELATOS
Assistant U.S. Attorney
Tel. (718) 254-6182
Fax: (718) 254-6081
John.Vagelatos@USDOJ.gov